IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEREK KERR,

      Plaintiff,

  v.

THE CITY AND COUNTY OF SAN
FRANCISCO; MITCHELL H. KATZ;
MIVIC HIROSE; and COLLEEN RILEY,

      Defendants.

_____/

No. C 10-5733 CW

ORDER GRANTING IN
PART AND DENYING
IN PART MOTION FOR
SUMMARY JUDGMENT
(Docket No. 40)
AND GRANTING
MOTION TO SEAL
(Docket No. 61)

Defendants City and County of San Francisco (the City), Mitchell H. Katz, Mivic Hirose and Colleen Riley move for summary judgment on the claims asserted against them by Plaintiff Derek Kerr in this action claiming termination of employment in retaliation. Plaintiff opposes their motion in part. Having considered the papers filed by the parties and their arguments at the hearing, the Court GRANTS Defendants' motion in part and DENIES it in part. The Court also GRANTS Plaintiff's motion to seal.

BACKGROUND

The following summary presents any disputed facts in the light most favorable to Plaintiff, as the non-moving party.[1]

_____

[1] To the extent that the Court relies on any evidence to which Defendants object, the Court rules on the objection prior to considering the evidence. Where necessary, such rulings are discussed below. To the extent that the Court decides the motion without considering evidence to which Defendants have objected, Defendants' objections are OVERRULED as moot.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Plaintiff graduated from Harvard Medical School in 1975. Kerr Depo. 32:20-21.  After finishing his internship, residency and senior residency at the Harlem Medical Center, Plaintiff completed two fellowships at Memorial Sloan-Kettering Cancer Center.  Id. at 32:22-33:17.  He then practiced oncology and palliative care at Fairmont Hospital in San Leandro, California for six years.  Id. at 33:18-22.  Starting in 1989 and for the next twenty-one years, Plaintiff was employed by the City as a hospice and palliative care physician at Laguna Honda Hospital (LHH) until he was terminated in June 2010.  Id. at 33:24-34:4. The parties agree that Plaintiff was an excellent doctor and brought acclaim to the hospice program at LHH during the time that he was there.  See, e.g., Hirose Depo. 25:3-13.  At the time of his termination, he held the position of Senior Physician Specialist, Civil Service Classification 2232.  Hirose Decl. ¶ 1; Kerr Depo. 72:16-20.

At the time relevant to this case, Dr. Mitchell Katz was the Director of Health in charge of the San Francisco Department of Public Health (DPH).  Katz Decl. ¶ 1.  He is now the Director of Health Services for the County of Los Angeles.  Id.  In March 2009, Dr. Katz appointed Mivic Hirose to be Executive Director for LHH, and she remains in that position at the present time.  Hirose Decl. ¶ 1; Katz Decl. ¶ 8.  In consultation with Dr. Katz, Ms. Hirose appointed Dr. Colleen Riley to the position of Medical Director of LHH, and she assumed that position on December 26, 2009.  Riley Decl. ¶¶ 1, 3; Katz Decl. ¶ 8.  Prior to that time, Dr. Riley was a Senior Physician Specialist, Civil Service Classification 2232, at LHH.  Riley Decl. ¶ 1.

United States District Court
For the Northern District of California

Since about 1998, Plaintiff has been in a long-term relationship with another doctor at LHH, Dr. Maria Rivero.  Kerr Depo. 25:1-27:3.  At all times relevant to this action, Dr. Katz, Dr. Riley and Ms. Hirose were aware that Plaintiff and Dr. Rivero were a couple.  Katz Depo. 33:14-20; Riley Depo. 65:9-66:1; Hirose Depo. 300:13-301:3.  It was Ms. Hirose's experience that Plaintiff and Dr. Rivero often jointly raised issues at LHH, and she understood that if one of them was expressing a concern, it "was likely shared by the other."  Hirose Depo. 44:18-45:7, 301:4-14.

In August 2009, Davis Ja & Associates, a consulting firm hired by the City to assess behavioral health services at LHH, issued a report (the Ja Report).  Riley Decl. ¶ 4; Kerr Depo. 55:13-14.  The Ja Report recommended, among other things, that the City replace some primary care physicians with mental health professionals.  Riley Decl. ¶ 4; Kerr Depo. 274:18-22.  Many of the physicians at LHH were upset by this recommendation, in part because the number of physicians at the facility had been gradually decreased over the years.  Riley Decl. ¶ 4.

In mid-August 2009, at a staff meeting, Plaintiff expressed concerns about the Ja Report to Ms. Hirose.  Kerr Depo. 58:2-16. After the meeting, Ms. Hirose issued a brochure that stated that the medical executive committee at LHH had approved the Ja Report. Id. at 59:5-23.  Plaintiff later spoke to the members of the medical executive committee and they each told him that they had not voted to approve the report.  Id. at 60:2-22.  See also Thompson Depo. 138:2-24 (recalling "controversy" that "it's true that the med exec members had been involved in discussion related

to that report," but that "med exec committee had not acted in any way on that report").

After the release of the report, there were several meetings of medical staff members interested in drafting a resolution in response to it. Rivero Depo. 159:23-160:9. Plaintiff and Dr. Rivero wrote a petition based on the staff's consensus views. Id. The petition, entitled "Resolution of the LHH Medicine Service," stated in part that, "because of concerns related to bias, inadequate data, flawed methodology, and lack of professional qualifications to assess physician services," they disputed the Ja Report's recommendation related to the replacement of physicians with nurses, social workers and psychologists. Stephenson Decl., Ex. E. Plaintiff's petition also stated, "It is our professional opinion that this recommendation is invalid, inappropriate, unethical and potentially harmful to our patents, as well as to their safe discharge to more integrated settings." Id. Plaintiff and Dr. Rivero circulated the petition, and it was signed by almost all of the physicians at LHH, including Dr. Riley. Rivero Depo. 160:15-25; Riley Decl. ¶ 5.

Plaintiff and Dr. Rivero also drafted a twenty-five page critical analysis of the Ja Report, entitled "The Ja Report: A Job Half Done." Stephenson Decl., Ex. F. In their critique, they expressed a number of concerns about the methodology and recommendations of the Ja Report, including an allegation that Dr. Ja had not disclosed his potential biases, because he co-owned property and shared a residential address with a high level manager in the Community Behavioral Health Services (CBHS) of the DPH, the agency that had contracted with Davis Ja & Associates to

United States District Court
For the Northern District of California

conduct the study.[2]  Id. at 13.  Plaintiff's critique did not disclose the person's name.  Id.  On September 15 and 16, 2009, Plaintiff emailed a copy of his critique to a number of individuals, including Dr. Riley, Dr. Katz and Ms. Hirose. Stephenson Decl., Ex. G.  See also Katz Decl. ¶ 17 (acknowledging that he received and "skimmed" the critique of the Ja Report prepared by Plaintiff and Dr. Rivero).

On September 18, 2009, Plaintiff and Dr. Rivero also filed a complaint with the City's Ethics Commission and the Controller's Whistle Blower program regarding the alleged conflict of interest, and named Deborah Sherwood as the high-level CBHS manager who shared a personal relationship with Ja.  Compl. ¶ 9; Kerr Depo. 44:20-47:23; Kerr Depo., Ex. 2, PL00001-7.  Dr. Riley, Dr. Katz and Ms. Hirose did not learn that Plaintiff and Dr. Rivero had filed this formal complaint until late 2010 or thereafter.  Hirose Decl. ¶ 13; Riley Decl. ¶ 5; Kerr Decl. ¶ 18.

While Plaintiff was researching the Ja Report, he also learned that Dr. Katz was a paid consultant for Health Management Associates (HMA).  Kerr Depo. 84:9-85:8; Katz Decl. ¶ 22.  On September 21, 2009, Plaintiff and Dr. Rivero filed a second complaint with the City's Ethics Commission and the Controller's Whistle Blower program, alleging that HMA had an ongoing contract

---

[2] Defendants state that Plaintiff's critique "did not raise any allegation of a conflict of interest relating to" this individual, and that the allegation was first raised in the March 2010 whistleblower complaint.  Reply at 4 n.5.  However, Plaintiff and Dr. Rivero alleged that this conflict of interest resulted in potential bias in the "A Job Half Done" critique, see Stephenson Decl., Ex. F, 13, and raised the issue in the September 18, 2009 whistleblower complaint filed by Plaintiff and Dr. Rivero, see Kerr Depo., Ex. 2, PL00001.

United States District Court
For the Northern District of California

with the City Controller to provide advisory services to both the DPH and the City Controller, and that Dr. Katz's financial relationship with HMA created various concerns, including that HMA may have received favorable treatment in being awarded the contract with the City. Kerr Depo., Ex. 3.[3]  Drs. Riley and Katz did not learn of the formal complaint regarding Dr. Katz's relationship with HMA until Plaintiff initiated the instant lawsuit. Riley Decl. ¶ 25; Kerr Decl. ¶ 22.

Several weeks before filing the complaint about HMA and Dr. Katz, Plaintiff discussed the purported conflict with several people, including Dr. Debra Brown, who did not work at LHH, but he did not discuss it with doctors at LHH, except Dr. Rivero. Kerr Depo. 85:15-87:2. Dr. Brown and Plaintiff both served as stewards for their respective facilities in their union, the Union of American Physicians and Dentists (UAPD). Id.  On September 8, 2009, Dr. Brown sent an email that referenced the alleged conflict involving HMA and Dr. Katz to a number of people at LHH or otherwise in the UAPD, including Dr. Riley. Stephenson Decl., Ex. H.[4]  Dr. Brown sent this email as a reply to an email circulated by Plaintiff and included the text of Plaintiff's email at the

_____

[3] Plaintiff stated in his opposition brief that the contract between the DPH and HMA was approved by Dr. Katz. Opp. at 2. However, he did not make this allegation in his deposition or in the formal complaint lodged with the Ethics Commission and the Whistle Blower program.  Instead, he attached documents to that complaint showing that the contract was signed by other city officials and was approved by members of the Health Commission Finance Committee, not Dr. Katz. Kerr Depo., Ex. 3.

[4] In his deposition testimony, Plaintiff identifies Dr. Brown as the sender of the email. Kerr Depo. 85:18-86:24.  The email was sent by "Doctorbeth" and was signed by "Deb." Stephenson Decl., Ex. H.

bottom of her email.  Id.  Plaintiff's email had discussed the

purported Ja conflict of interest and did not mention the conflict

of interest involving HMA and Dr. Katz.  Id.  In her email, Dr.

Brown summarized Plaintiff's allegations about Ja and Sherwood,

and then stated,

> And then Mitch Katz was taking money and travel funds in
> 2009 to consult for HMA, which got $300,000 from the
> city in 2005 to review the medical services model at
> Laguna Honda.
>
> How much more creepy conflict of interest behavior are
> we likely to uncover during all this?

Id.  One person who may have received this email, Dr. Steven

Thompson, the Chief of Staff, testified that this was the type of

email that he might have forwarded it to Ms. Hirose.[5]

At around the same time, Dr. Rivero noticed that certain

patient activities were being cut because of a purported lack of

funds in the LHH Gift Fund.  Specifically, she noticed that bus

trips for patients to restaurants were decreased from once per

month to once per quarter.  Rivero Depo. 271:6-272:24.  She also

---

[5] There is no email address on Dr. Brown's email itself that appears to correspond to Dr. Thompson.  Dr. Thompson did not testify that he received it and testified instead that he "probably" saw the e-mail before.  Thompson Depo. 289:5-290:6. Sometime in 2011, Dr. Thompson deleted all of the emails on his personal computer related to LHH, and does not have any records of this.  Id. at 232:1-234.

Ms. Hirose testified that Dr. Thompson on occasion forwarded her emails that he thought were inflammatory.  Hirose Depo. 295:16-23.  Neither party cites any testimony or other evidence showing that Ms. Hirose did or did not receive a forward from Dr. Thompson containing this or any other particular email from Plaintiff or anyone else.  Defendants represent that "LHH preserved and produced all relevant LHH email files, including Dr. Hirose's received mail containing the e-mails Thomas [sic] sent her."  Reply at 6 n.8.  Plaintiff has not offered any emails from Ms. Hirose's email box that were sent by Dr. Thompson.

United States District Court
For the Northern District of California

was denied money for tacos for patients on one occasion and was told that the "gift fund was bankrupt." Rivero Depo. 174:15-23; 271:6-272:24; Kerr Depo. 118:23-119:2. Dr. Rivero and Plaintiff wanted to find out if the fund was actually bankrupt and where the money had gone. Rivero Depo. 174:13-175:21; Kerr Depo. 118:23-120:1.

On October 31, 2009, Dr. Rivero sent a public records request to LHH, asking for all documents showing, among other things, the quarterly balance of the Gift Fund, each payment into the Gift Fund, and each withdrawal or payment from the Gift Fund. Rivero Depo. 171:10-172:13, Ex. 34. She sent the request to several individuals at LHH, including Ms. Hirose's assistant. Id. Plaintiff's name did not appear on the records request, and he was blind carbon copied on the email. Rivero Depo. 171:10-172:25, Ex. 34. On November 10, 2009, at the hospital executive committee meeting, Tess Navarro, the Chief Financial Officer for LHH, informed the committee of Dr. Rivero's document request, because it was a large request, to which a lot of staff time would be required to respond. Navarro Depo. 79:10-82:17. At some point between September and November 2009, Ms. Navarro had brought to Ms. Hirose's attention that they needed to revise the policies for the Gift Fund to match the procedures that they were practicing. Hirose Depo. 81:4-82:19, 95:10-96:5.

In the fall of 2009, the Mayor instructed DPH and all other City departments to submit proposals for mid-year budget cuts. Katz Decl. ¶ 9. The Mayor was seeking to cut thirteen million dollars from the DPH budget that had been set in June 2009, and asked that departments find savings in the current and future

fiscal years. Id. During this time, LHH was also preparing for an upcoming move in late 2010 to a new, smaller facility. Katz Decl. ¶ 5. In the old facility, the residents were housed in thirty-bed units, whereas in the new facility, residents live in sixty-bed "neighborhoods." Riley Decl. ¶ 2. In the transition, the twenty-five bed hospice unit would merge with thirty-five other residents requiring palliative care and enhanced support to form a single neighborhood. Id.

Dr. Katz and Ms. Hirose discussed the proposed mid-year budget cuts for LHH shortly before DPH submitted its proposal to the Mayor's office in December 2009. Katz Decl. ¶ 11; Hirose Decl. ¶ 7. One way to reduce the LHH budget that they identified was to reduce physician staffing by a .55 full time equivalent (FTE) position. Katz Decl. ¶ 11. Under this proposal, LHH would eliminate two Civil Service Classification 2232, Senior Physician Specialists positions at 1.55 FTE and use some of the savings to employ a 1.0 FTE Civil Service Classification 2230 Physician Specialist, who is compensated at a lower rate than a 2232 position, to continue to provide enough coverage for night and weekend shifts. Hirose Decl. ¶ 7; Katz Decl. ¶ 11. Ms. Hirose proposed eliminating the 2232 positions held by Plaintiff, funded at .75 FTE, and by Dr. Denis Bouvier, funded at .80 FTE. Hirose Decl. ¶ 7. DPH submitted the mid-year budget cut proposal to the Mayor's office in December 2009. Katz Decl. ¶ 15. It also submitted the proposal to the Health Commission without identifying the specific employees who would be affected. Id.

In her declaration, Ms. Hirose states that she proposed to eliminate Plaintiff's position, in part because she had noted that

United States District Court
For the Northern District of California

9

**United States District Court**
For the Northern District of California

while many other doctors were already caring for about sixty residents, Plaintiff had at all times maintained a caseload of approximately twenty-five residents and insisted on providing care only to residents of his hospice unit, unlike all other hospital doctors, who routinely assisted in the treatment and care of residents in their ward and elsewhere.[6]   Hirose Decl. ¶¶ 5, 9. Ms. Hirose believed that this made him less suited than other doctors for the new sixty-resident neighborhood model, which would generally require each doctor to be responsible for that number of patients.   Id. at ¶¶ 4-5, 9.   At that time, Ms. Hirose knew only that Plaintiff had twenty-five patients, but did not know if he would be willing to take on additional patients.   Hirose Depo. 15:21-16:14.   However, Ms. Hirose also admitted during her deposition that, in certain wards with a high number of admissions, such as the hospice ward on which Plaintiff worked, she assigns a lower than average patient load to each doctor because of the extra responsibilities associated with admissions. Hirose Depo. 168:1-170:14.

Dr. Katz testified that he agreed with the recommendation to eliminate Plaintiff's position "on the basis of patients and hours."   Katz Depo. 216:9-15.   While he believed that Plaintiff did not cover other wards, he was unable to state any reason for this belief, and he stated that this belief was not the reason that he agreed with the recommendation.   Id. at 216:1-19.

_____

[6] Plaintiff asserts that Ms. Hirose admitted that she had no personal knowledge of whether he covered his share of wards.   Opp. at 18.   However, he cites no testimony or other evidence in which Ms. Hirose made any such admission.

United States District Court
For the Northern District of California

On December 24, 2009 and January 20, 2010, Dr. Rivero made two additional public records requests for documents related to the Gift Fund. Exs. 112, 113. Plaintiff's name did not appear on either of these subsequent requests. Id. In the requests, Dr. Rivero did not state why she sought this information, and the LHH officials did not ask her why she made these requests. Rivero Depo. 173:10-175:7.

After Dr. Riley assumed the Medical Director position in late December 2009, she questioned whether Plaintiff would agree to perform new or different duties outside of the hospice unit, as would be required of all doctors at the new facility. Riley Decl. ¶ 10. Her concerns were based on (1) her own observation that, for the time she worked at LHH, the only unit regularly under Plaintiff's supervision was the hospice, which had twenty-five patients, (2) documents in his personnel file that indicated that he was unwilling to take on duties beyond hospice and would do so reluctantly only after a great deal of prodding by previous Medical Directors, (3) the fact that he did not regularly cover units when another physician was on his or her regular day off, and (4) conversations with other employees, including a former Medical Director, about Plaintiff's unwillingness to work outside of the hospice. Id.

Other doctors had similar experiences with Plaintiff, but did not believe his preferences to be out of the ordinary for doctors at LHH. Dr. Banchero-Hasson, the Chief of Medicine from 2006 through the present, who was responsible for scheduling and handling staff absences, testified that Plaintiff took on more coverage assignments during the time that she was in that

11

position.  Banchero-Hassan Depo. 17:7-21, 44:14-18.  In the
beginning, Plaintiff would not do coverage for other people or
other units.  Id. at 44:14-16.  Over the years, he increased his
coverage, and took beeper assignments that were equivalent to
other physicians.  Id. at 44:16-45:10.  He did not do the same
volume of ward coverage as other physicians, because Dr. Banchero-
Hasson was aware that his preference was being in the hospice and
she used someone more willing to cover the rest of the hospital
than Plaintiff was.  Id. at 46:3-14.  When Dr. Banchero-Hasson
asked him to cover certain things, he did not refuse her requests
but would sometimes negotiate and ask to do other things.  Id. at
46:15-47:5.  In her experience, other doctors also resisted doing
coverage.  Id. at 152:1-11.  Other doctors also had certain
preferences, such as not working with male patients or on the
chronic wards.  Id. at 43:1-12.  Dr. Banchero-Hasson tried to
accommodate what each doctor wanted to do when making their
assignments.  Id. at 45:12-19.

On February 4, 2010, to address her concerns, Dr. Riley met
with Plaintiff to ask him to provide regular coverage one day a
week for a part-time physician.  Riley Decl. ¶ 11.  There is no
evidence that she told him that failure to do so would jeopardize
his job.  Plaintiff declined to do so and wrote her an email
explaining why he could not increase his workload to cover another
physician.  Riley Decl. ¶ 11, Ex. D.  Plaintiff stated that he
"simply cannot do more clinical coverage."  Id.  He explained that
the hospice unit was an intensive and highly taxing unit on which
to work, that he regularly committed extra time to the LHH in ways
that were not considered "work," such as serving as the UAPD

United States District Court
For the Northern District of California

steward, and that he often stayed late or came in on weekends on unpaid time. Id. He also stated that he had been hired to provide specialist care in the hospice, not general internal medicine, and that "[r]egularly covering a General Medical ward would be excessive and unprecedented in my case." Id. Instead of regularly covering the other ward, Plaintiff offered to take on other types of additional duties to save work for other physicians, and suggested that Dr. Riley ask certain other doctors who had expressed willingness to increase their hours to provide the coverage. Id. Dr. Riley subsequently told Ms. Hirose of this exchange.

Dr. Riley acknowledged that there was a policy at LHH about how to address physicians who exhibited performance issues. Riley Depo. 291:1-20. First, the physician would be counseled on the issue. Id. at 291:1-11. If the issue came up a second time, they would generally have a second counseling, this time documented. Id. at 291:12-15. If the issue came up a third time, further steps beyond a documented warning could happen. Id. at 291:16-20. While she acknowledged that refusal to take on other clinical assignments would be a performance issue that would normally be addressed first through the counseling process, Dr. Riley did not counsel Plaintiff and testified that she had "no reason" for failing to do so. Id. at 291:25-293:10.

On March 2, 2010, Plaintiff and Dr. Rivero sent the Ethics Commission and the Controller's Whistleblower Program a third complaint, this one entitled "Statement of Concern--Laguna Honda Hospital Gift Fund." Kerr Depo. 121:25-122:17, Ex. 109. In this document, they stated that, under the San Francisco Administrative

United States District Court
For the Northern District of California

Code, the Gift Fund was established "for the general benefit and comfort of patients," and that the LHH policy on the Gift Fund states that it was a "restricted" fund "available neither to support the minimum obligations of the City to operate the Hospital nor to fund routine City expenditures," but rather that it was to be used to "benefit residents in general to enhance the quality of life of residents beyond the basic care provided by the City at the Hospital." Ex. 109 at PL00080. They alleged that, among other things, the funds were being improperly spent on catered meals, travel expenses and training for staff, while amenities and activities for residents were cut. Id. at PL00080-88.[7] Dr. Katz first learned of this formal complaint in late 2010 after the filing of this lawsuit. Katz Decl. ¶ 22.

Plaintiff was notified in a letter dated March 5, 2010 that he would be terminated effective May 8, 2010. Stephenson Decl., Ex. M. His termination date was later pushed back to June 11, 2010. Several 2232 positions were posted after Plaintiff received his layoff notice. Riley Decl. ¶ 24. Most or all of these positions became available because of the retirement of other

---

[7] Plaintiff states that, during this period, Ms. Hirose also had "been involved in correspondence and discussion about a number of procedural and fiscal irregularities involving the Gift Fund." Opp. at 2. However, the single email that he cites in support of this statement does not appear related to the allegations in his complaints. In the email, Ms. Hirose was asked about expenditures on the annual report for the Gift Fund, which showed that the expenditures were larger than the amount received into the fund. Stephenson Decl., Ex. I. Ms. Hirose explained what LHH was doing to resolve the issue. Id. She stated that they had realized that they were spending more than they were receiving, that they had determined what they were spending the excess amount on and were seeking alternative funding sources for some of those items, and that they asked the director of therapeutic activities at LHH to make a budget projection and reduce spending. Id.

members of the LHH medical staff, including Dr. Rivero.  Id.

Plaintiff was eligible to apply for these positions, but did not.

Id.  Drs. Katz and Riley did not consider moving Plaintiff into

one of the vacant positions and having him perform one of those

jobs without an application from him, although they had the

authority to do so.  Katz Depo. 247:4-23.

On March 13, 2010, Plaintiff filed a fourth formal complaint

with the Ethics Commission alleging that his termination had been

in retaliation for his earlier complaints related to the Gift

Fund, the Ja Report and the HMA conflict of interest.  Kerr Depo.

259:1-14, Ex. 110.

After Plaintiff received his termination notice, other staff

members expressed to Dr. Riley that they were upset that he was

fired.  Riley Decl. ¶ 19.  In mid-March, the hospice staff gave

Dr. Riley a petition praising Plaintiff at length, expressing

concern that his termination would negatively impact the patients

and asking about the future development of the LHH hospice and

palliative care program.  Riley Decl. ¶ 19, Ex. F.  On March 27,

2010, a number of physicians gave Dr. Riley a petition expressing

concerns about the proposed layoffs of Dr. Bouvier and Plaintiff

from the 2232 positions and stated that these actions would have

various adverse impacts on the provision of medical care at LHH.

Riley Decl. ¶ 22, Ex. G.

On April 16, 2010, Drs. Thompson and Riley met with Plaintiff

to transition his patients to Dr. Bouvier, who was selected to

become the temporary hospice physician in addition to performing

other duties.  Riley Decl. ¶ 21; Riley Depo. 174:3-13.  Although

Dr. Bouvier held the other 2232 position that was to be

15

United States District Court
For the Northern District of California

eliminated, he also held an alternate position as a 2230 Physician

Specialist at the LHH.  Riley Decl. ¶ 7.  After the elimination of

his 2232 position, Dr. Bouvier continued to work night and weekend

shifts at LHH in the 2230 position.  Id. at ¶ 8.  Dr. Riley held

the meeting in order to have overlap of Plaintiff and Dr.

Bouvier's care for the patients in the hospice ward.  Id. at ¶ 21.

In late May 2010, the ABC7 News I-Team at the television

station KGO, the local ABC affiliate, aired multiple investigative

reports featuring Plaintiff and Dr. Rivero detailing their

allegations of the mismanagement of the Gift Fund.  Stephenson

Decl., Exs. N, EE.[8]  Ms. Hirose, Dr. Riley and Dr. Katz claim that

they first learned that Plaintiff and Dr. Rivero were complaining

about the Gift Fund through the production and airing of these

news reports.  Hirose Decl. ¶ 15; Riley Decl. ¶ 16; Katz Decl.

---

[8] Defendants object to these exhibits, stating that "this evidence is not relevant, lacks foundation, and is hearsay." Reply at 2 n.2.  Defendants make identical, conclusory objections to a number of Plaintiff's exhibits.  Defendants' objections are vague and provide no explanation as to why they believe any particular exhibit is objectionable.  All of their evidentiary objections are overruled for their vagueness.  See, e.g, Californians for Disability Rights, Inc. v. Cal. DOT, 249 F.R.D. 334, 350 (N.D. Cal. 2008) (declining "to analyze objections that defendants did not themselves bother to analyze" and overruling their objections as unduly vague); Cmtys. Actively Living Indep. & Free v. City of Los Angeles, 2011 U.S. Dist. LEXIS 118364, at *27-28 (C.D. Cal.) ("It is not the Court's responsibility to attempt to discern the City's grounds for objecting to evidence submitted by Plaintiffs where the City merely repeats the same categorical objections but provides little to no explanation as to why the subject evidence is objectionable.").

Further, these objections are baseless.  The evidence of the news reports is clearly relevant.  Plaintiff claims in part that Defendants terminated him because of these reports.  Multiple witnesses, including each of the individual Defendants, testified that they saw or were aware of these reports.  Further, the reports are not offered to prove the truth of the matter asserted therein and are therefore not hearsay.

**United States District Court**
For the Northern District of California

¶ 19.  The news reports did not disclose that Plaintiff and Dr. Rivero had filed formal complaints with the Ethics Commission and the Controller's Whistleblower Program.  Stephenson Decl., Exs. N, EE.

At any point until Plaintiff's termination was effective on June 11, 2010, Dr. Katz could have revoked his termination notice. Katz Depo. 124:9-14.  Until that time, Dr. Riley or Ms. Hirose also could have moved Plaintiff into one of the open 2232 positions.  Hirose Depo. 278:10-16, 289:7-290:20.  One of those positions was filled by Dr. Emily Lee, who was a personal friend of Ms. Hirose before she began work at the LHH.  Id. at 291:6-292:8.

On September 2, 2010, Dr. Katz issued a press release responding to the ABC7 news story.  Stephenson Decl., Ex. O.  In it, he described records requests submitted by "two former Laguna Honda employees" related to the Gift Fund.  Id.  He stated that, in reviewing documents, LHH had found two checks that should have been deposited into the patient fund and were instead put into the staff development fund, and that the errors had been corrected. Id.  He also asserted that "there have been inaccurate statements made and broadcast about the patient gift fund," that he expected "these false statements to continue," and that he believed "our detractors will cite these two errors as proof that their allegations were correct, even though these two errors in no way influenced the amount of money available for patient activities." Id.  Finally, he stated that LHH had asked the Controller's Office to conduct an audit of the Gift Fund accounting practices.  Id.

On November 12, 2010, Plaintiff initiated the instant case in San Francisco Superior Court.  Defendants thereafter removed it to federal court.

Sometime in the fall of 2010, the District Attorney's office contacted Dr. Katz regarding his relationship with HMA.  Katz Decl. ¶ 22.  The investigator told him that someone had alleged that he had a conflict of interest because he had done work for HMA, which had a contract with the City.  Id.  The investigator did not tell him who made the allegations.  Id.  Sometime after that, Dr. Katz also spoke with an investigator from the Ethics Commission.  Id.

On November 22, 2010, the Controller's Office, City Services Auditor issued an audit report finding a variety of issues with the LHH's Gift Fund.  Stephenson Decl., Ex. J.[9]  Among other things, the audit found that "Laguna Honda incorrectly recorded a total of $151,739 in donations, operations income, and interest to the Gift Fund's staff development subaccounts instead of to the patient subaccounts and operating income."  Id. at 13.

At the time that LHH moved to the new facility in December 2010, the neighborhood that included the hospice was assigned to two physicians, Dr. Bouvier and Dr. Williams, although the plan

---

[9] As discussed above, Defendants make a conclusory objection to this report, stating that it "is not relevant, lacks foundation, and is hearsay."  However, this report is clearly relevant to Plaintiff's claims.  The fact that the City's own Auditor found later that there had in fact been misuse of the Gift Fund is probative of Defendants' motives in terminating Plaintiff. Defendants do not dispute the authenticity of this or any other exhibit.  Finally, this report was issued by the City and is a public record, and is therefore either non-hearsay or subject to a hearsay exception.  See Federal Rules of Evidence 801(d)(2) and 803(8).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

had originally been to assign only one physician to this neighborhood. Riley Decl. ¶ 15. Both Dr. Bouvier and Dr. Williams also had other duties. Id. Dr. Williams was assigned about thirty-three palliative care residents, covered other units, was on-call, did consults and was in charge of developing hospital-wide palliative care and consultation programs. Riley Decl. ¶ 15; Williams Depo. 79:13-20. Dr. Bouvier was the primary physician for approximately twenty-seven to twenty-nine hospice residents, along with thirty to sixty residents in another ward, because another physician had unexpectedly departed. Id.; Williams Depo. 81:14-23; 84:2-7. At some point in late 2010, Dr. Bouvier was given a 2232 appointment again. Riley Depo. 174:8-25.

On July 29, 2011, the Controller's Office terminated its contract with the Ja firm. In the termination letter, it stated in part, "In responding to a Sunshine request submitted by a member of the public, I recently became aware of irregularities in the solicitation and negotiation processes that led to the award of the contract. In light of these issues, I have determined that it is in the City's interests to terminate the contract as soon as possible." Stephenson Decl., Ex. P.

In Plaintiff's complaint in the instant case, he asserts claims under 42 U.S.C. § 1983 for deprivation of his First Amendment freedom of speech rights and deprivation of due process under the Fourteenth Amendment, and claims for violation of California Government Code section 53298, California Health and Safety Code section 1432 and California Labor Code section 1102.5(b).

Defendants filed their motion for summary judgment on May 31, 2012 on all of Plaintiff's claims. Docket No. 40.

On July 16, 2012, the parties filed a stipulation withdrawing a motion to file under seal and stating that Plaintiff would not be opposing the motion for summary judgment as it relates to his due process claim and that he consented to the Court entering an order against him in connection with that cause of action. Docket No. 55. The Court granted the stipulation on July 17, 2012. Docket No. 58.

Plaintiff filed his opposition to Defendants' motion for summary judgment on July 19, 2012 and re-filed it on July 20, 2012. In it, he stated that he does not oppose the motion as to "his second and third causes of action for deprivation of his fourteenth amendment due process rights and violation of California Government Code §53298." Opp. at 4. Plaintiff opposed the motion as to the other three causes of action only. Id.

DISCUSSION

I. Motion for summary judgment

A. Legal standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as

true the opposing party's evidence, if supported by affidavits or other evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If

United States District Court
For the Northern District of California

the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id.  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

B. Section 1983 free speech claim

Plaintiff asserts that his termination was in retaliation for complaining about the Ja Report, expressing concerns about Dr. Katz's potential conflict of interest with HMA, inquiring into and bringing attention to the Gift Fund and filing formal complaints regarding these three topics.

"In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action."  Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

2003) (citations omitted).  Defendants do not dispute that
Plaintiff's termination constituted an adverse employment action.
They contend that Plaintiff cannot show that he engaged in
protected speech that was a motivating factor for his termination.

　　　　　　1.　Protected speech

　　Defendants do not dispute that Plaintiff's formal complaints
constituted protected speech.  However, they argue that his public
discussion of the Ja Report and the open records requests related
to the Gift Fund did not constitute protected speech.  They also
contend that, other than his formal complaints, he did not engage
in public speech about Dr. Katz's purported conflict of interest
with HMA.

　　　　　　a.　The Ja Report

　　"An employee's speech is protected under the First Amendment
if it addresses 'a matter of legitimate public concern.'"
Coszalter, 320 F.3d at 973 (quoting Pickering v. Bd. of Educ., 391
U.S. 563, 571 (1968)).  "Speech that concerns issues about which
information is needed or appropriate to enable the members of
society to make informed decisions about the operation of their
government merits the highest degree of first amendment
protection."  Id. (internal quotations and formatting omitted).
"On the other hand, speech that deals with 'individual personnel
disputes and grievances' and that would be of 'no relevance to the
public's evaluation of the performance of governmental agencies'
is generally not of 'public concern.'"  Id. (quoting McKinley v.
City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983)).  See also Roe
v. City & Cnty. of San Francisco, 109 F.3d 578, 585 (9th Cir.
1997) ("the content of the communication must be of broader

**United States District Court**
For the Northern District of California

societal concern.  The focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance.").  "The determination of whether an employee's speech deals with an issue of public concern is to be made with reference to the content, form, and context of the speech."  Coszalter, 320 F.3d at 973-74 (internal quotations omitted).

Defendants contend that the petition circulated by Plaintiff and Dr. Rivero and the "A Job Half Done" critique of the Ja Report were not matters of public concern because they addressed only personnel disputes and grievances.  They do not dispute that Defendants knew about the petition and critique.

The Court disagrees.  In Ulrich v. City & County of San Francisco, 308 F.3d 968 (2002), the Ninth Circuit found that the district court erred when it concluded that a former doctor's speech about the layoff of physicians at LHH was not protected.  The Ninth Circuit concluded that, because the doctor's speech had "touched on the ability of the hospital to care adequately for patients," it involved a matter of public concern.  Id. at 978-79.  Similarly, here, in the petition, Plaintiff and the other doctors expressed concern that the replacement of physicians with nursing staff, social workers and psychologists would be "potentially harmful to our patents, as well as to their safe discharge to more integrated settings."  Stephenson Decl., Ex. E.  In the "A Job Half Done" critique, Plaintiff and Dr. Rivero discussed at length their concerns regarding the impact that the Ja Report's recommendations would have on patient care.  Further, in that critique, Plaintiff and Dr. Rivero also highlighted the conflict

of interest between Sherwood and Ja, which could have introduced bias into the Ja Report.

Although Defendants suggest that the speech was not protected because it would not reach the public at large, the fact that Plaintiff brought these allegations openly within the institution in multiple forums indicates "that he spoke order to bring wrongdoing to light, not merely to further some purely private interest." Ulrich, 308 F.3d at 979. "Where speech is so directed, the public employee does not forfeit protection against governmental retaliation because he chose to press his cause internally." Id.

Defendants also argue that Plaintiff acted within his duties as a City employee and union representative and that therefore his speech is not protected. Mot. at 16 (citing Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline")). "[S]tatements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." Dahlia v. Rodriguez, 2012 WL 3185693, at *5 (9th Cir.) (quoting Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)) (formatting in original). Plaintiff's complaints here were not encompassed within his official duties as a hospice physician and he was not paid to make these criticisms. Defendants also offer no evidence or authority for the proposition

25

United States District Court
For the Northern District of California

that Plaintiff's statements in his capacity as a union representative are encompassed in his official physician duties as a public employee or even that Plaintiff performed the activities at issue here in his role as a union representative.  Notably, Plaintiff and Dr. Rivero clearly stated in the "A Job Half Done" critique that its content consisted of their own personal views. Accordingly, the Court concludes that the petition and "A Job Half Done" critique were protected speech.

> b.   Dr. Katz's alleged conflict of interest with HMA

Defendants argue that Plaintiff can offer no evidence that he engaged in any earlier protected speech, other than the formal complaint, regarding Dr. Katz's purported conflict of interest based on his relationship with HMA.  In his response, Plaintiff states that he "first expressed concern about Katz' potential conflict in early September 2009 in group emails that circulated among all LHH physicians and other UAPD members."  Opp. at 9.  At the hearing, Plaintiff acknowledged that the only email that discussed the Katz conflict of interest was a September 8, 2009 email that was sent by Dr. Brown, not Plaintiff.  Stephenson Decl., Ex. H.  Although it was sent as a reply to a prior email sent by Plaintiff, Plaintiff's email did not mention this conflict of interest and Dr. Brown did not present the suspicions about Dr. Katz as held by Plaintiff rather than herself.  Accordingly, the Court finds that there is no evidence that, other than through his formal complaint, Plaintiff engaged in protected speech related to Dr. Katz's purported conflict of interest.

United States District Court
For the Northern District of California

c.   Gift Fund

Defendants do not dispute that the ABC7 news report on Plaintiff's Gift Fund allegations constituted protected speech. Defendants argue that the Sunshine public records requests did not constitute protected speech for two reasons: first, that Dr. Rivero, not Plaintiff, submitted these requests; and second, that the requests were not expressive speech.

The Court finds that there is a material dispute of fact as to both of these points.  As to the first, although Dr. Rivero submitted the public records requests, Plaintiff has offered evidence that she did so in collaboration with him.  Further, each of the individual Defendants testified that, at the time of the relevant events, they knew that Plaintiff and Dr. Rivero were a couple, and Ms. Hirose understood that complaints submitted by one of them likely came from both.  Katz Depo. 33:14-20; Riley Depo. 65:9-66:1; Hirose Depo. 44:18-45:7, 300:13-14.  See Toronyi v. Barrington Cmty. Unit Sch. Dist. 220, 2005 U.S. Dist. LEXIS 3065, at *19-20 (N.D. Ill.) ("standing by" a spouse's speech found to constitute protected expressive conduct).

As to whether the requests were expressive speech, under the circumstances presented here, a reasonable factfinder could infer Dr. Rivero and Plaintiff intended to convey a message that they suspected that the Gift Fund was being managed and used improperly.  "Conduct is expressive when 'an intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'"  Thomas v. City of Beaverton, 379 F.3d 802, 810 (9th Cir. 2004) (quoting Spence v. Washington,

418 U.S. 405, 410-11 (1974)).  "A 'narrow, succinctly articulable message' is not required."  Kaahumanu v. Hawaii, 682 F.3d 789, 798 (9th Cir. 2012) (quoting Hurley v. Irish-American Gay, 515 U.S. 557, 569 (1995)).  The records requests were made at a time when the couple was widely known within LHH to be criticizing publicly other alleged misconduct and to be engaged in thorough analysis in support of that criticism.  A person who received the broad information requests related to the Gift Fund could reasonably have inferred that Plaintiff and Dr. Rivero were similarly investigating the use of the Gift Fund.

2.   Substantial or motivating factor

To prove that his expressive conduct was a substantial or motivating factor for his termination, a plaintiff can "(1) introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) introduce evidence that the employer expressed opposition to the speech; or (3) introduce evidence that the proffered explanations for the adverse action were false and pretextual."  Anthoine v. North Central Counties Consortium, 605 F.3d 740, 750 (9th Cir. 2010) (citing Coszalter, 320 F.3d at 975).

a.   The formal complaints

In order to retaliate on the basis of speech, "an employer must be aware of that speech."  Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002).

Plaintiff has offered no evidence that Dr. Katz, Ms. Hirose and Dr. Riley knew of Plaintiff's four formal complaints before

his final day at LHH, and the individual Defendants testified that they did not.

Plaintiff argues that the Court should nevertheless infer that Dr. Katz knew about the complaint involving the HMA conflict of interest.  Opp. at 10-11.  He contends that, because Dr. Katz testified that, on November 10, 2009, he realized that he had signed one of the HMA contracts and contacted the City Attorney to discuss the issue, the Court should infer that Dr. Katz knew at that time that someone had raised a conflict of interest issue. Plaintiff further urges the Court to infer that Dr. Katz would have assumed that Plaintiff was the complainant, because he had raised allegations of another unrelated conflict of interest in response to the Ja Report.  However, "mere allegation and speculation do not create a factual dispute for purposes of summary judgment."  Nelson v. Pima Community College, 83 F.3d 1075, 1081-1082 (9th Cir. 1996) (citing Witherow v. Paff, 52 F.3d 264, 266 (9th Cir. 1995)).

Similarly, Plaintiff asks the Court to infer that the Whistleblower Program contacted Dr. Katz and told him of the complaint, although he offers no evidence that it did so and relies on speculation.  Further, the record includes testimony from a representative of the Whistleblower Program that it did not notify DPH of the complaints lodged with it by Plaintiff and Dr. Rivero.  Lediju Depo. 103:4-108:3.

Accordingly, the Court finds that there is no evidence that Defendants were aware of the four formal complaints, and thus that they could not have retaliated against Plaintiff based on this speech.

United States District Court
For the Northern District of California

b.    Ja Report

Defendants contend that Plaintiff cannot establish that his responses to the Ja Report were a substantial or motivating factor for his termination, because these criticisms took place "almost a year before his layoff" and because others, including Defendant Dr. Riley, joined his criticism of the report.  Mot. at 17.

The evidence establishes that Dr. Katz and Ms. Hirose first proposed to cut Plaintiff's position in early December 2009. Plaintiff and Dr. Rivero circulated the petition and their critique of the Ja Report in August and September of 2009.  This time frame of three to four months is close enough to support an inference of causation based on temporal proximity.  See Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

It is true that Dr. Riley joined the petition criticizing the Ja Report, although there is no evidence that she agreed with Plaintiff's longer written critique.  However, Dr. Riley was subsequently appointed to a management role by Ms. Hirose and Dr. Katz, and there is evidence that Ms. Hirose publicly expressed opposition to Plaintiff's speech.  Specifically, Plaintiff has offered testimony that Ms. Hirose defended the Ja Report publicly against his criticism by stating that the medical executive committee supported the Ja Report, although members of the medical executive committee denied this.  The Court finds that a reasonable factfinder could conclude that Dr. Riley did in fact participate in retaliation against Plaintiff for his speech, despite her initial agreement with it, after she was moved into a management position by higher-level managers who were openly critical of the speech.

United States District Court
For the Northern District of California

Finally, there is a material dispute of fact as to whether the non-retaliatory reasons proffered by Defendants to select Plaintiff's position for termination were false.  Defendants state that he was less flexible than other doctors at the facility about covering other wards and that he was responsible for fewer patients than other doctors were.  However, Plaintiff has offered evidence that other doctors were similarly resistant to covering other wards and had preferences for the type of work that they did, and that he worked on an admitting ward where doctors were expected to care for fewer patients than on non-admitting wards.  Further, although Defendants state that they were required to eliminate Plaintiff's 2232 position in the hospice ward for budgetary reasons, Dr. Bouvier, the only other doctor affected by the budget cuts, was given a 2232 position in the hospice less than seven months after Plaintiff was terminated and that 2232 position was purportedly eliminated.

Accordingly, Plaintiff has introduced evidence sufficient to create a material dispute of fact as to whether his responses to the Ja Report were a substantial or motivating factor for his termination.

c.   ABC7 news reports

Plaintiff also contends that Defendants retaliated against him for the ABC7 news reports, in which he publicly spoke out against the alleged mismanagement of the Gift Fund.  His termination went into effect just a few weeks after the airing of the reports.  His termination was not rescinded when it could have been, and he was not transferred to the other open positions.

31

United States District Court
For the Northern District of California

It is clear that Plaintiff's participation in these news reports was protected speech.  Plaintiff has also offered evidence that each of the individual Defendants was aware of the ABC7 reports and had the authority either to revoke his termination or to offer him one of the several open 2232 positions within LHH at the time.  They did not, despite their testimony that they would normally use any available means not to terminate a physician. Dr. Katz acknowledged that they could have put him into one of the positions without the necessity of waiting for him to apply, but stated that he did not want to do so.  Defendants provided no explanation why they did not move to the hospice ward one of the 2232 positions open at the time of Plaintiff's termination in order to retain him.  Finally, as previously noted, Dr. Riley testified that, when Plaintiff was terminated, Dr. Bouvier was assigned to the hospice ward in his stead in a 2230 position and was ultimately given a 2232 position in the hospice, less than seven months after Plaintiff's termination.

Accordingly, the Court finds that Plaintiff has established a material dispute of fact as to whether his termination was carried out in retaliation for the ABC7 news reports.

C. Section 1983 claims against the City

The City contends that it is entitled to summary judgment on Plaintiff's § 1983 claim, because he has not established that Dr. Katz was a "final policymaker."  Plaintiff's § 1983 claim against the City can only be brought in accordance with Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978).  Although a city may not be held vicariously liable for the unconstitutional acts of its employees on the basis of an employer-employee relationship with

32

United States District Court
For the Northern District of California

the tortfeasor, it may be held liable under <u>Monell</u> when a municipal policy or custom causes an employee to violate another's constitutional right. <u>Id.</u> at 691-92.

The Ninth Circuit has held that municipal liability under <u>Monell</u> may be established in one of three ways: (1) "the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" or (3) "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1346-47 (9th Cir. 1992). <u>See also</u> <u>Hyland v. Wonder</u>, 117 F.3d 405, 414 (9th Cir. 1997) ("a plaintiff may show that an official policymaker either delegated policymaking authority to a subordinate or ratified a subordinate's decision, approving the decision and the basis for it") (internal quotation marks omitted).

Plaintiff contends that Dr. Katz had final policymaking authority over the decision to terminate him, that he delegated this authority to Ms. Hirose and that he ratified her decision. Although Defendants admit that Dr. Katz participated in the decision to terminate Plaintiff, Defendants contend that the Civil Service Commission (CSC), not Dr. Katz, is the final policymaker with respect to employment and personnel matters.

United States District Court
For the Northern District of California

To determine if Dr. Katz was acting as the final policymaker for the City, the Court must first "identify the particular area or issue for which the official is alleged to be the final policymaker," and second, "analyze state law to discern the official's actual function with respect to that particular area or issue." <u>Cortez v. Cnty. of Los Angeles</u>, 294 F.3d 1186, 1189 (9th Cir. 2002) (citing <u>McMillan v. Monroe Co.</u>, 520 U.S. 781, 785-86 (1997)). "By reviewing state law, we seek to ascertain to what degree the municipality has control over the official's performance of the particular function and, thus, whether the municipality can be held liable for the official's actions." <u>Id.</u> The parties agree that "a city's Charter determines municipal affairs such as personnel matters." <u>Hyland</u>, 117 F.3d at 414. <u>See</u> Mot. at 18; Opp. at 23.

Here, Plaintiff contends that Dr. Katz was the final policymaker regarding the termination of exempt employees within the DPH. Defendants are correct that "under the Charter of the City and County of San Francisco . . . , the CSC is generally 'the final policymaker with respect to employment matters.'" <u>Molex v. City & Cnty. of San Francisco</u>, 2012 U.S. Dist. LEXIS 103890, at *43 (N.D. Cal.) (quoting <u>Schiff v. City & Cnty. of San Francisco</u>, 816 F. Supp. 2d 798, 812-13 (N.D. Cal. 2011); <u>Harris v. City & Cnty. of San Francisco</u>, 2009 U.S. Dist. LEXIS 69186, at *14 (N.D. Cal.)). The Charter provides that the CSC "shall adopt rules, policies and procedures to carry out the civil service merit system provisions of this charter and, except as otherwise provided in this Charter, such rules shall govern" a specific list of employment matters, including "lay-offs or reduction in force,

34

both permanent and temporary, due to lack of work or funds, retrenchment or completion of work." S.F. Charter § 10.101.

However, the Charter also provides that certain positions "shall be exempt from competitive civil service selection, appointment and removal procedures, and the person serving in the position shall serve at the pleasure of the appointing authority." S.F. Charter § 10.104. This includes "physicians and dentists serving in their professional capacity (except those physicians and dentists whose duties are significantly administrative or supervisory)." S.F. Charter § 10.104(13). Here, there is no dispute that Plaintiff was an exempt employee. See, e.g., Jacobi Depo. 36:7-15.

Further, Defendants admit that, pursuant to San Francisco Administrative Code section 2A.30, Dr. Katz was the appointing officer for employees within the DPH. Reply at 11. Under this provision, the "department head shall act as the 'appointing officer' under the civil service provisions of the Charter for the appointing, disciplining and removal of such officers, assistants and employees as may be authorized." S.F. Admin. Code § 2A.30. This section also provides, "Non-civil service appointments and any temporary appointments in any department or subdivision thereof, and all removals therefrom shall be made by the department head, bureau head or other subdivision head designated as the appointing officer." Id.

Defendants contend that the Charter removes exempt employees from supervision by the CSC only for limited purposes, and that exempt employees are otherwise still subject to CSC rules. However, even if this were true, the portions of the Charter and

35

United States District Court
For the Northern District of California

Administrative Code cited above specifically exclude exempt employees from the authority of the CSC for removal procedures, state that they shall serve at the pleasure of the appointing officer and allow that appointing officer to make all removals from these positions.  See Hyland v. Wonder, 117 F.3d 405, 416 (9th Cir. 1997) (rejecting an argument by San Francisco defendants "that the CSC had the final policymaking authority over personnel decisions" as "irrelevant, as the positions for which Hyland applied were civil service exempt").

Defendants also argue that the mere fact that Dr. Katz had discretion to select which employee would be removed is not enough to make him a final policymaker.  "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability."  City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988).  "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."  Id. at 127.  "Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies."  Id.  Thus, the "authority to exercise discretion while performing certain functions does not make the official a final policymaker unless the decisions are final, unreviewable, and not constrained by the official policies of supervisors."  Zografos v. City of San Francisco, 2006 U.S. Dist. LEXIS 90101, at *46 (N.D. Cal.).

United States District Court
For the Northern District of California

Defendants argue that there are a number of other CSC rules that apply to exempt employees and that constrained Dr. Katz's ability to terminate Plaintiff.  They point specifically to Rule 103, which addresses Equal Employment Opportunity.  See S.F. Civ. Serv. Comm'n Rule 103.  This provision states, in relevant part,

> It is the policy of the Civil Service Commission of the City and County of San Francisco that all persons shall have equal opportunity in employment; that selection of employees to positions in the City and County be made on the basis of merit; and that continuing programs be maintained to afford equal employment opportunities at all levels.  Vigorous enforcement of the laws against discrimination shall be carried out at every level of each department.  All persons shall have equal access to employment within the City and County, limited only by their ability to do the job. . . .
>
> No person shall be appointed, reduced, removed, or in any way favored or discriminated against in employment or opportunity for employment because of race, color, sex, sexual orientation, gender identity, political affiliation, age, religion, creed, national origin, disability, ancestry, marital status, parental status, domestic partner status, medical condition (cancer-related), ethnicity or the conditions Acquired Immune Deficiency Syndrome (AIDS), HIV, and AIDS-related conditions or other non-merit factors or any other category provided by ordinance.

S.F. Civ. Serv. Comm'n Rule 103.1.1-2.  The City's Rule 30(b)(6) witness testified that, in general, no one reviews the decision of the director of health as to which exempt physician is subject to a layoff and that no one has "the authority to overrule the director of health's decision, either himself or through his delegated representative, the executive administrator of Laguna Honda, who to make subject to layoff among the exempt physicians at Laguna Honda."  Jacobi July 11, 2012 Depo. at 45:7-23.  This was subject only to the limitation that the director's "decision can't be prohibited by law," meaning that if someone alleges that "it was discrimination," the decision would be subject to review

United States District Court
For the Northern District of California

to resolve the allegations of discrimination by the City's Human Resources Director, whose decision can be appealed to the CSC. Id. at 45:23-47:1. The Human Resources Director does not review layoff decisions if the complaint is that someone was retaliated against on the basis of whistle-blowing. Id. at 47:13-18. Thus, by the City's own admission, this rule did not constrain Dr. Katz's decisionmaking or provide for review in any way applicable to the case at hand.

Defendants also point to San Francisco Campaign and Government Conduct Code section 4.115, which provides, "No City officer or employee may terminate, demote, suspend or take other similar adverse employment action against any City officer or employee because the officer or employee has in good faith" filed a complaint with the Ethics Commission, the Controller's Whistleblower Program or cooperated with any such investigation. S.F. Campaign & Gov't Conduct Code § 4.115(a). At the hearing, Defendants also relied on a provision in the Sunshine Ordinance, which provides,

> Public employees shall not be discouraged from or disciplined for the expression of their personal opinions on any matter of public concern while not on duty, so long as the opinion (1) is not represented as that of the department and does not misrepresent the department position; and (2) does not disrupt coworker relations, impair discipline or control by superiors, erode a close working relationship premised on personal loyalty and confidentiality, interfere with the employee's performance of his or her duties or obstruct the routine operation of the office in a manner that outweighs the employee's interests in expressing that opinion. In adopting this subdivision, the Board of Supervisors intends merely to restate and affirm court decisions recognizing the First Amendment rights enjoyed by public employees. Nothing in this section shall be construed to provide rights to City employees beyond those recognized by courts, now or in the future, under

the First Amendment, or to create any new private cause of action or defense to disciplinary action.

S.F. Admin. Code § 67.22(d).  They argue that these sections constrained Dr. Katz's power when deciding to terminate Plaintiff here.

However, the Ninth Circuit has held that a "general statement" that a person to whom decision-making power is delegated "is not authorized to violate the law" is not sufficient to insulate a governmental entity from liability "without more." Lytle v. Carl, 382 F.3d 978, 985 (9th Cir. 2004).  In that case, the Ninth Circuit found that a school superintendent and assistant superintendent were final policymakers with respect to employee discipline where their decisions were unreviewable by any school district official, even though the Board of Trustees had delegated them this power to be exercised in accordance with "applicable negotiated agreements, laws, board policies, and regulations." Id. at 984-85.  As explained more recently in a non-precedential Ninth Circuit case, Uhl v. Lake Havasu City, 2010 U.S. App. LEXIS 241 (9th Cir.), in which, like here, employees served at the purported policymaker's "pleasure," it "is not sufficient that a city personnel rule in theory" bound the decisionmaker "to comply with the law," where his or her decision was ultimately unreviewable.  Id. at *8-9.

Similarly, here, the rules that Defendants cite do not provide for review of the actual termination decision and instead simply require that Dr. Katz comply with the law in making such decisions.  As quoted above, the City clearly states that section 67.22(d) of the Administrative Code is meant "merely to restate and affirm court decisions recognizing the First Amendment rights

United States District Court
For the Northern District of California

enjoyed by public employees." Although Defendants argued at the hearing that this limitation can be reviewed and enforced through CSC Rule 103, their Rule 30(b)(6) witness disclaimed that whistleblower retaliation claims were subject to this process, as previously discussed. Although section 4.115 of the Campaign and Government Conduct Code allows for the sanctioning of an officer or employee who engages in retaliation, S.F. Campaign & Gov't Conduct Code § 4.115(c), it does not appear to provide for review or reversal of the unlawful decision itself, and Defendants did not argue to the contrary at the hearing. Further, by its terms, section 4.115 only sets forth a policy against retaliation for the filing of formal complaints and participating in formal investigations, not retaliation for any protected First Amendment speech, such as Plaintiff's critique of the Ja Report or his speaking with reporters for the ABC7 news story. S.F. Campaign & Gov't Conduct Code § 4.115(a).

Accordingly, here, Dr. Katz held final policymaking authority in deciding to terminate Plaintiff. Thus, the Court finds that Plaintiff has presented evidence of <u>Monell</u> liability against the City, and DENIES Defendants' motion for summary judgment on the § 1983 claim against the City.

D. State law claims

1.   Health and Safety Code section 1432

Plaintiff brings a claim against Defendants for violation of California Health and Safety Code section 1432, which, among other things, prohibits retaliation against an employee at a long-term health care facility "on the basis or for the reason" that the employee "presented a grievance or complaint, or has initiated or

40

cooperated in any investigation or proceeding of any governmental entity relating to care, services, or conditions at that facility."  Cal. Health & Safety Code § 1432(a).

Defendants argue that section 1432 does not create a private cause of action for enforcement.  Section 1432 states, "A licensee who violates this section is subject to a civil penalty of no more than ten thousand dollars ($10,000), to be assessed by the director and collected in the manner provided in Section 1430." Cal. Health & Safety Code § 1432(a).

Plaintiff responds that California Health and Safety Code section 1430(a) creates a private cause of action for a violation of section 1432(a).  Section 1430(a) states,

> Except where the state department has taken action and the violations have been corrected to its satisfaction, a licensee who commits a class "A" or "B" violation may be enjoined from permitting the violation to continue or may be sued for civil damages within a court of competent jurisdiction.  An action for injunction or civil damages, or both, may be prosecuted by the Attorney General in the name of the people of the State of California upon his or her own complaint or upon the complaint of a board, officer, person, corporation, or association, or by a person acting for the interests of itself, its members, or the general public.  The amount of civil damages that may be recovered in an action brought pursuant to this section may not exceed the maximum amount of civil penalties that could be assessed on account of the violation or violations.

Cal. Health & Safety Code § 1430(a).  This section thus creates a private cause of action to prosecute what it describes as class A and class B violations.  The definitions of such violations are set forth in section 1424.  That section defines class A violations as

> violations which the state department determines present either (1) imminent danger that death or serious harm to the patients or residents of the long-term health care facility would result therefrom, or (2) substantial probability that death or serious physical harm to

patients or residents of the long-term health care
facility would result therefrom.

Cal. Health & Safety Code § 1424(d).  It defines class B

violations as "violations that the state department determines

have a direct or immediate relationship to the health, safety, or

security of long-term health care facility patients or residents,"

including "any violation of a patient's rights as set forth in

Sections 72527 and 73523 of Title 22 of the California Code of

Regulations, that is determined by the state department to cause

or under circumstances likely to cause significant humiliation,

indignity, anxiety, or other emotional trauma to a patient."  Id.

at § 1424(e).

Plaintiff has presented no argument or evidence that his

claims qualify as either class A or class B violations, or that

the relevant state agency has made a determination that they do.

Accordingly, the Court GRANTS Defendants' motion for summary

judgment on his section 1432 claim.

2.   Labor Code section 1102.5(b)

Under section 1102.5(b), an "employer may not retaliate

against an employee for disclosing information to a government or

law enforcement agency, where the employee has reasonable cause to

believe that the information discloses a violation of state or

federal statute, or a violation or noncompliance with a state or

federal rule or regulation."  Cal. Lab. Code § 1102.5(b).  "A

report made by an employee of a government agency to his or her

employer is a disclosure of information to a government or law

enforcement agency pursuant to subdivisions (a) and (b)."  Cal.

Lab. Code § 1102.5(e).

United States District Court
For the Northern District of California

To survive summary judgment, a plaintiff must first establish a prima facie case of retaliation, which requires him or her to "show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." Patten v. Grant Joint Union High Sch. Dist., 134 Cal. App. 4th 1378, 1384 (2005).  If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to "provide a legitimate, nonretaliatory explanation for its acts."  Id. at 1384.  If the defendant does so, the plaintiff must "show this explanation is merely a pretext for the retaliation."  Id.

Defendants argue that Plaintiff did not engage in protected activity, because he did not reasonably believe that his complaints disclosed any alleged violation of federal or state law.  The separate conflicts of interest involving Drs. Katz and Ja that Plaintiff described in his complaints could have violated several state laws.  See Cal. Govt. Code § 87100 ("No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."); Cal. Govt. Code § 1090 ("Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members.").  His media and formal complaints about the mismanagement and misuse of the Gift Fund also implicated several state laws.  See, e.g., Cal. Bus. & Prof. Code §§ 17510.8

43

**United States District Court**
For the Northern District of California

1   (creating a fiduciary relationship between a charity and the

2   person from whom a charitable contribution is solicited), 17510.5

3   (record keeping requirements for soliciting organizations); see

4   also People v. Orange County Charitable Services, 73 Cal. App. 4th

5   1054, 1075 (1999) (fraudulent charitable solicitation).  However,

6   the public records requests related to the Gift Fund did not show

7   any reasonable belief on Plaintiff's part that he was disclosing

8   alleged violations of these sections.  The media reports about the

9   Gift Fund were not complaints directed to a government or law

10  enforcement agency, as required to come under the protection of

11  section 1102.5(b).

12      As discussed above, because the individual Defendants did not

13  learn of Plaintiff's formal complaints until after his last day at

14  LHH, Plaintiff has not established a causal link between them and

15  his termination.  Further, outside of his formal complaints,

16  Plaintiff has not offered evidence that he made a protected

17  complaint about Dr. Katz's alleged conflict of interest.  However,

18  Plaintiff has offered sufficient evidence that he disclosed to his

19  government employer possible violations of state or federal law

20  based on the conflicts of interest involving Dr. Ja and Ms.

21  Sherwood in the "A Job Half Done" critique, and that this was

22  causally connected to his termination.

23      Accordingly, the Court GRANTS Defendants' motion for summary

24  judgment on the Labor Code section 1102.5(b) claim to the extent

25  Plaintiff alleges retaliation for his four formal complaints and

26  the records requests and media reports about the Gift Fund, and

27  DENIES it to the extent Plaintiff alleges retaliation for the

28  petition and critique of the Ja Report.

United States District Court
For the Northern District of California

II.  Motion to seal

Plaintiff moves to seal Exhibit W to the declaration of Mathew Stephenson submitted in opposition to Defendants' motion for summary judgment.  Plaintiff represents that Defendants have designated this exhibit as confidential.  Defendants have filed a declaration in support of Plaintiff's motion.  See Docket No. 68.

Plaintiff's filings are connected to a dispositive motion. Because Defendants designated the document at issue as confidential, they must file a declaration establishing that the document is sealable.  Civil Local Rule 79-5(d).  To do so, Defendants "must overcome a strong presumption of access by showing that 'compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure.'"  Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 679 (9th Cir. 2010) (citation omitted).  This cannot be established simply by showing that the document is subject to a protective order or by stating in general terms that the material is considered to be confidential, but rather must be supported by a sworn declaration demonstrating with particularity the need to file each document under seal.  Civil Local Rule 79-5(a).

Defendants attest that Exhibit W contains a draft policy document related to the City's Whistleblower Program.  They represent that public disclosure of this document would "divulge information regarding the Whistleblower Program's investigative and deliberative process."  Rolnick Decl. ¶ 10.  They also state that, "because it is not an official policy or procedure, disclosure might create the public preception [sic] that this is,

45

**United States District Court**
For the Northern District of California

1  in fact, the office's policy and thereby compromise the Program's

2  work or make it more difficult." Id.

3      Having reviewed the contents of Exhibit W, the Court finds

4  that Defendants have established that it is sealable.

5  Accordingly, Plaintiff's motion to file under seal is GRANTED.

6                              CONCLUSION

7      For the reasons set forth above, the Court GRANTS in part

8  Defendants' motion for summary judgment and DENIES it in part

9  (Docket No. 40).  The Court grants Defendants' motion as unopposed

10 as to Plaintiff's claims for deprivation of his Fourteenth

11 Amendment due process rights and for violation of California

12 Government Code section 53298.  The Court also grants Defendants

13 summary judgment on Plaintiff's Health and Safety Code section

14 1432 claim for retaliation against a long-term health care

15 facility employee because there is no private right of action

16 given the lack of evidence that he complained of class A or class

17 B violations.  The Court further grants Defendants summary

18 judgment on Plaintiff's § 1983 free speech claim to the extent he

19 alleges retaliation based on the filing of his formal complaints

20 and otherwise expressing concern about Dr. Katz's alleged conflict

21 of interest.  There is no evidence of causation as to the formal

22 complaints and no evidence of other protected speech on that

23 subject.  However, the Court denies summary judgment on this claim

24 to the extent it is based on the petition, the "A Job Half Done"

25 critique, the public records requests related to the Gift Fund and

26 participation in the ABC7 news reports.  Finally, the Court grants

27 Defendants summary judgment on Plaintiff's Labor Code section

28 1102.5 claim to the extent that it is based on the formal

United States District Court
For the Northern District of California

1   complaints, expressing concern about Dr. Katz's alleged conflict

2   of interest, and the media reports and public records requests

3   related to the Gift Fund, but denies Defendants summary judgment

4   on this claim to the extent it is based on the petition and "A Job

5   Half Done" critique of the Ja Report.

6       The Court GRANTS Plaintiff's motion to file Exhibit W to the

7   Stephenson declaration under seal (Docket No. 61).  Within four

8   days of the date of this Order, Plaintiff shall file this document

9   under seal.

10      The final pretrial conference set for October 31, 2012 at

11  2:00 p.m. and ten-day jury trial set to begin on November 13, 2012

12  at 8:30 a.m. are MAINTAINED.

13      IT IS SO ORDERED.

14

15  Dated:  9/6/2012

16                              CLAUDIA WILKEN
                                United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

47